s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s

| | | |
|---|---|---|
| Melissa Burriola, etc., | : | Case No. 3:00CV7593 |
| Plaintiff, | : | (Hon. James G. Carr) |
| vs. | : | **MEMORANDUM IN OPPOSITION** |
| | | **TO PLAINTIFF'S MOTION FOR** |
| Greater Toledo YMCA, *et al.*, | : | **PRELIMINARY INJUNCTION** |
| Defendants. | : | |

s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s

## I.  THE PERTINENT ALLEGATIONS

Plaintiff alleges the YMCA of Greater Toledo unlawfully dismissed Jordan Burriola, an 8-year-old autistic child, from its group child care program held at the Calvary United Methodist Church because of his disability.  More specifically, plaintiff claims a violation of Title III of the Americans With Disabilities Act ("Title III").  42 U.S.C. §12182, *et seq.*   While plaintiff does not identify a specific subsection under Title III, the primary allegation is that the defendants failed to provide Jordan "with reasonable modifications to enable him to participate in the day care program, thus discriminating against

him by denying him the opportunity to fully participate in the program or to benefit from its services."

(Complaint, ¶28.)  See 42 U.S.C. §12182(b)(2)(A)(ii).

Plaintiff also alleges a violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 and O.R.C. §4112.02(G).  Like the Title III claim, the essence of these claims is that Jordan was allegedly denied participation in, and the benefits of, the group day care program due to defendants' failure to make reasonable modifications to accommodate Jordan's needs.

Plaintiff's final claim is that Jordan's removal from the group day care program constituted intentional infliction of emotional distress under Ohio common law.

Plaintiff has requested a variety of relief.  At issue on Wednesday, November 1, 2000, is plaintiff's request for a preliminary injunction requiring defendants to immediately reinstate Jordan into the YMCA group child care program at Calvary United Methodist Church, with appropriate program modifications in place.

## II.  THE FACTUAL BACKGROUND

The YMCA of Greater Toledo operates licensed group day care facilities at 51 locations for 2,600 children in the greater Toledo area.  It is the largest provider of group child care in the community.  More than 200 children with special needs are in the program.  More than 10 are autistic. Its facility at the Calvary United Methodist Church is licensed to provide group day care for up to 54 children both before and after school.  The license requires a minimum ratio of 1 counselor for every 18 children in attendance at any particular time.  The YMCA does not, and never has, operated individual care child care programs.

2

Jordan Burriola is an 8-year-old child who has been diagnosed with autism. He was admitted to the YMCA group child care program in January, 1999, well after this diagnosis. The YMCA was aware of this diagnosis at the time of his admission. Jordan's brother Michael, who is not disabled, was admitted to the YMCA program at about the same time. Mrs. Burriola is in the process of a divorce, and both children live with her. She is employed as the lead drafts person by Toltest.

Jordan's participation in the YMCA group child care program at Calvary differed from his brother's and many of the other program attendees. The program is what is commonly known as a "latch key" program which primarily serves elementary students at the Longfellow School: parents beginning work before their children's school starting time drop their children off at Calvary on the way to work and then pick them up on the way home from work in the evening. Longfellow students are escorted in a group to school at Longfellow by YMCA counselors in the morning and are picked up and escorted to Calvary after school. (Other students are transported by YMCA to and from the Larchmont Elementary School and a local parish school.) Except during Summer and holiday vacation periods, child care is generally for approximately two hours in the morning and two to three hours in the afternoon. Jordan's brother Michael attends Longfellow School and follows this pattern. Jordan, however, has never attended Longfellow School as he is enrolled in the M.O.D.E.L. Community School in Maumee, Ohio. (The M.O.D.E.L. Community School is a charter school that was established in 1998 to serve the needs of autistic children between the ages of 5 and 9. There are currently 27 children enrolled in the M.O.D.E.L. Community School.) As a result, Jordan was bussed to Calvary after school where he stayed for approximately 2-1/2 hours with his brother Michael until picked up by their Mother.

Autistic children have special needs.  Expert testimony will establish that Jordan requires a regimented and highly structured schedule which is free from over-stimulation, and a quiet place where he will not be disturbed, interrupted or overly stimulated by other children.  Like many autistic children, he can react strongly and, sometimes, violently to over-stimulation, which may result from loud noises, interruptions and inadvertent physical contact.  The M.O.D.E.L. Community School provides such an environment for Jordan during the day, where student-to-teacher ratios are nearly 1 on 2.  Unfortunately, the YMCA group child care program at Calvary did not and could not provide such an environment without fundamentally altering the nature of the program.  From his enrollment until he was removed from the program in September, 2000, Jordan engaged in a consistent pattern of misbehavior, including several incidents of violence involving counselors and other children, including:

1.  Biting another child (June 11, 1999);

2.  Throwing objects in an unsafe manner, and chasing other children around the room (September 24, 1999);

3.  Knocking other children down, cursing, and spitting on other children (October 18, 1999);

4.  Spitting on another child (January 13, 2000);

5.  Punching another child in the face (March 27, 2000);

6.  Fighting with another child, cursing at adults, and hitting a supervisor "in his private parts" (May 4, 2000);

7.  Biting another child (June 30, 2000);

8.  Pulling down his pants, urinating on the floor, biting a supervisor (July 24, 2000);

9.  Hitting another child in the eye (July 31, 2000);

4

10.    Knocking down one child, punching another child in the stomach, pinching a supervisor (August 28, 2000);

11.    Grabbing a child's foot while the child walked past him, and cursing at supervisor (August 28, 2000);

12.    Holding door to stairway closed so counselor could not open it (August 31, 2000);

13.    Punching another child in the stomach three times when the child had accidentally bumped his table (September 5, 2000);

14.    Trapping himself and another child in the bathroom (September 5, 2000);

15.    Biting another child on the arm (September 6, 2000); and

16.    Striking another child on the arm with a music stick, and hitting the same child on the head (September 7, 2000).

As a result of these incidents, which included increased violence towards other children and adults, Jordan was disenrolled from the program as of September 8, 2000.  Since that time, Jordan has been cared for after school by neighbors who are familiar with autistic children and who have watched him in the evenings or on weekends for several years.   Jordan enjoys this and, from Mrs. Burriola's standpoint, it is "working out as well -- at least as well as him being at the Y after-school program..." and he "enjoys being with their children as well."  (Burriola Deposition, pg. 31.)

5

### III.  STANDARDS FOR A PRELIMINARY INJUNCTION

Clear and convincing evidence is necessary to establish entitlement to a preliminary injunction.  *Deck v. City of Toledo*, 29 F. Supp. 2d 431 (N.D. Ohio 1998), citing *Garlock, Inc. v. United Steel, Inc.*, 404 F.2d 256 (6th Cir. 1968).  That proof is:

1.  Whether the movant has a "strong" likelihood of success on the merits;

2.  Whether the movant would otherwise suffer irreparable injury;

3.  Whether issuance of a preliminary injunction would cause substantial harm to others;

4.  Whether the public interest would be served by the issuance of a preliminary injunction.

*Sandison v. Michigan High School Athletic Ass'n* (6th Cir. 1995), 64 F.3d 1026, 1030.  These factors are simply considerations, not prerequisites, to guide the discretion of the court.  *Id.*

Plaintiff will fail to prove elements 1, 2, 3 and 4.  First, and as explained more fully below, plaintiff has no strong likelihood of success on the merits.  Plaintiff will be unable to establish that the modifications necessary to accommodate Jordan's disability would not fundamentally alter the nature of defendants' group child care program.  Defendants have chosen a group program rather than an individual child care program.  This is their right.  See Section IV.A.1. below.  Close one-on-one supervision in a quiet and isolated place is not part of a group child care program, nor can it be accomplished at the Calvary facility.  Fundamental alterations of a program to accommodate a disability are not required by the law.

Second, there will be no evidence that Jordan will suffer irreparable injury.  Jordan is presently being cared for after school by neighbors who are familiar with autistic children and, from Mrs. Burriola's standpoint, this arrangement is working out as well as Jordan being in the YMCA program.  Further, there will be evidence that numerous other opportunities exist in the community for Jordan's care, both with and without government-financed assistance.  In fact, such care is available on a one-to-one basis.  While it may be more convenient for Mrs. Burriola to pick up both of her children from one facility after work, the law does not require nor contemplate the accommodation of the parent of a disabled child who may find it more convenient to pick up both of her children from one child care center rather than two.

Third, the granting of a preliminary injunction could cause the likelihood of substantial harm to the public and to others.  There will be persuasive evidence from Dr. Dura that Jordan's penchant for physically aggressive behavior and harm to other children and counselors is a direct threat to himself and others unless he is placed in a controlled and quiet environment with one-on-one supervision.  Furthermore, Dr. Dura will testify that Jordan's placement at Calvary, even with the supports suggested by plaintiff's experts, would not be in Jordan's best interests.  The risks of harm to others far outweighs any considerations of the convenience of reinstating Jordan to the program under speculative circumstances.  See Section IV.A.2. below.

IV.    **ARGUMENT AS TO WHY A TITLE III PRELIM-
       INARY INJUNCTION MUST BE DENIED.**

A.    **There is no strong likelihood that plaintiff will succeed on
      the merits.**

1.    Plaintiff's requested modifications would fundamentally alter the
      nature of defendants' group child care services.

Title III's general prohibition against discrimination on the basis of a disability states:

> No individual shall be discriminated against on the basis of disability in
> the full and equal enjoyment of the goods, services, facilities, privileges,
> advantages, or accommodations of any place of public accommodation
> by any person who owns, leases (or leases to), or operates a place of
> public accommodation.

42 U.S.C. §12182(a).  More specifically, the statute provides that it is unlawful to deny participation

in, or benefit from, goods, services, facilities, privileges, advantages, or accommodations of an entity on

the basis of a disability.  42 U.S.C. §12182(b)(1)(A)(i).

Although the specific subsection is not cited in the complaint, the substance of plaintiff's

Title III claim is described in 42 U.S.C. §12182(b)(2)(A)(ii), which provides that unlawful discrimination

includes:

> A failure to make reasonable modifications in policies, practices, or
> procedures, when such modifications are necessary to afford such
> goods, services, facilities, privileges, advantages, or accommodations to
> individuals with disabilities, unless the entity can demonstrate that making
> such modifications would fundamentally alter the nature of such goods,
> services, facilities, privileges, advantages, or accommodations.

Accordingly, defendants cannot be liable under this section if modifying the program

would fundamentally alter the nature of the day care services.  It is also possible that plaintiff is relying

on 42 U.S.C. §12182(b)(2)(A)(iii), which states that discrimination includes:

8

> A failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered orally result in an undue burden.

Regardless of which subsection plaintiff relies upon, defendants may not be held liable under Title III if accommodating Jordan would fundamentally alter the nature of their group day care services.

The "fundamentally alter" defense originated under the Rehabilitation Act in *Southeastern Community College v. Davis* (1979), 442 U.S. 397, 410, in which the Supreme Court held that under the Rehabilitation Act (which is generally analyzed similarly to the ADA), reasonable modifications did not include a fundamental alteration in the nature of the program offered. As such, it has been stated:

> In light of *Davis*, courts have repeatedly held that the ADA does not require entities to change their basic nature, character, or purpose insofar as that purpose is rational, rather than a pre-text for discrimination. See, e.g., *Sandison v. Michigan High Sch. Athletic Ass'n*, 64 F.3d 1026, 1035 (6th Cir. 1995) (rejecting disabled student's challenge to an athletic age requirement); *Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926 (8th Cir. 1994) (finding that waiving an essential eligibility standard would fundamentally alter the nature of the youth baseball program). In addition, under both the rehabilitation act and the ADA, courts consistently have concluded that an accommodation is not reasonable if it imposes an undue financial and administrative burden. See *School Bd. v. Arline*, 480 U.S. 273, 287 n. 17, *** (Rehabilitation Act), and *Sandison*, 64 F.3d at 1035 (ADA) ("it is plainly an undue burden to require high school coaches and hired physicians to determine [various] factors render a student's age an unfair competitive advantage *** it is unreasonable to call upon coaches and physicians to make these near impossible determinations.").

*Olinger v. United States Golf Ass'n.* (7th Cir. 2000), 205 F.3d 1001, 1005-1006.  Indeed, the Sixth

Circuit has recognized that a "modification" under the ADA "'connotes moderate change.'"  *Sandison*,

64 F.3d at 1037, citing *MCI Telecommunications Corp. v. AT&T* (1994), 512 U.S. 218.

Two cases address the issue of making modifications for a disabled child in a child care

setting.  *Roberts v. Kinder Care Learning Centers, Inc.* (D. Minn. 1995), 896 F. Supp. 921; and *Orr*

*v. Kinder Care Learning Centers, Inc.* (E.D. Cal., June 9, 1995), Case No. S-95-507, unreported

(see attached).  First, in *Roberts*, the plaintiff argued that Kinder Care had a duty under the ADA to

provide one-on-one care to a child with relatively serious developmental and learning disorders.  Indeed,

in that case, the child required one-on-one care at all times.  Although the parents of the child were able

to provide the individual with personal care the majority of the time, Kinder Care would have been

responsible for providing personal one-on-one care to the child on a regular basis as well.  Kinder Care

argued that this would amount to a fundamental alteration in the service that it provided, and the court

agreed, holding:

> This court has no difficulty concluding that requiring Kinder Care to
> provide one-on-one child care would fundamentally alter the nature of
> its service.  The undisputed evidence at trial establishes that there are at
> least two distinct types of child care service: group care and individual
> child care.  Kinder Care is in the group child care business and does not
> seek to provide individual child care.  It does not provide one-on-one
> child care on a regular basis to any child except as necessary to deal
> with temporary, urgent needs.  Requiring Kinder Care to provide one-
> on-one service essentially places it into a child care market it did not
> intend to enter.
>
> This court is unpersuaded by the Roberts' argument that because Kinder
> Care is in the business of providing child care, requiring one-on-one
> child care would not fundamentally alter its service.  The Roberts
> construe "service" too broadly.  ***  "The rule does not require

> modifications to the legitimate areas of specialization of service providers." 28 C.F.R. Pt. 36, App. B.  While requiring Kinder Care to provide one-on-one care would still leave it in a child care business, it would fundamentally alter the nature of the service Kinder Care provides.

*Roberts*, 896 F. Supp. at 926.  28 C.F.R. Pt. 36, App B., the Department of Justice Preamble to Regulation on Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, specifically provided:

> The rule does not require modifications to the legitimate areas of specialization of service providers.  Section 36.302(b) provides that a public accommodation may refer an individual with a disability to another public accommodation, if that individual is seeking, or requires, treatment or services outside of the referring public accommodation's area of specialization ...

Similarly, in *Orr*, a 9-year-old boy who suffered from tuberous sclerosis, a developmental disability causing mental retardation, low vision and mild seizures.  The child needed assistance in eating, walking and in interacting with other people.  He was also unable to talk and was not toilet trained.  Although he was 9 years old, the child was placed in day care with 2-year-old children.  At that point, the parents of the child sought to have an aid provided for the child at state expense to attend the Kinder Care program with the child.  The aid would change the child's diapers and generally assist him to facilitate his participation in the program.  Thereafter, Kinder Care notified the child's parents that it could not meet the child's individualized needs in a group care setting.  The parent then sought an injunction preventing Kinder Care from disenrolling the child during the pendency of the litigation.

In response to the motion for a preliminary injunction, Kinder Care argued that providing the child with one-on-one attention would fundamentally alter the nature of the services.  Moreover,

Kinder Care argued that the child's need for custodial care threatened its ability to care for other children.  In making the determination of whether the child's presence in Kinder Care caused a fundamental alteration in the essential nature of the services, the court looked at the eight months in which the child was enrolled at the Center.  Upon reviewing the evidence, the court noted that the child had not engaged in any behavior which necessitated constant one-on-one attention by a staff person and that he behaved appropriately if left alone by staff and the other children, and that the child did not pose a behavior problem.  As such, the court concluded that the child's presence did not amount to an alteration of the fundamental nature of the group day care offered by Kinder Care.  Significant in this conclusion was that the child had not been disruptive, engaged in inappropriate behavior, or otherwise distracted from the nature of the after school day care services provided.

In the present case, plaintiff claims that Jordan does not require extensive program modifications or one-on-one care at all times, alleging that simple additional training would enable Jordan to participate in the program without fundamentally altering the nature of the services.  Defendants submit, however, the compelling testimony of Dr. Jason Dura will establish that regardless of training, the YMCA Calvary program cannot be modified so as to accommodate Jordan's needs, or to assure the safety of Jordan and the other children in the program.

       2.       <u>Jordan's continued participation in the group day care setting would constitute a direct threat of physical harm to other children.</u>

A defendant cannot be liable under Title III when accommodating the plaintiff would pose "a direct threat to the health or safety of others."  42 U.S.C. §12182(b)(3).  In the present case,

12

due to Jordan's extensive history of physically aggressive behavior, his continued participation in the program would constitute a direct threat of harm to the other children in the program and to himself.

"The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." 42 U.S.C. §12182(b)(3). See, also, 28 C.F.R. §36.208(b). In determining whether an individual constitutes a direct threat to the health or safety of others:

> A public accommodation must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

28 C.F.R. §36.208(c).

Under the foregoing criteria, Jordan unquestionably poses a direct threat to the safety of the other children. In *J.H. v. ABC Care, Inc.* (D. Md. 1996), 953 F. Supp. 675, the court held that the misconduct by a young child in a group after school day care setting amounted to a direct threat to the other children. In *J.H.*, the child was enrolled in a after school day care program, and had an extensive history of "aggressive non-compliant behavior," which included biting, pinching, pushing, kicking, spitting, and throwing objects at other children. Ultimately, the child was removed from the group program and filed suit for injunctive relief under Title III. While the court found that plaintiff did not suffer from a disability, it went on to state:

> ... plaintiff merely argues that defendant ABC Day Care should have continued the unsuccessful procedures which had previously been pursued by attempting to control J.H.'s behavior including so-called "time-outs," isolation from other children, close facial contact and personal talks with the child when he misbehaved. But clearly, these

13

> procedures had consistently been followed and had utterly failed to control the child's behavior.  Indeed, if anything, defendant ABC Day Care was overly patient in continuing with its attempts to deal with this disruptive child.  The behavior of J.H. did indeed present a significant risk of harm to other children.  Not only did he engage in aggressive physical contact with other children, but also much of J.H.'s aggressive behavior had disturbing sexual overtones.  Defendant, ABC Day Care had an obligation to other parents to ensure that their child not be subjected to possible harm inflicted by J.H.

*Id.* at 682.

Likewise, in the present case, plaintiff seeks to have defendants permit Jordan to participate in the child care program despite his extensive history of aggressive behavior.  Although plaintiff claims that simple training would completely solve these serious problems, the persuasive testimony of Dr. Jason Dura will demonstrate otherwise.  Specifically Dr. Dura will testify that Jordan is aggressive and at times violent.  Dr. Dura's opinion is that the only way to protect the students and counselors from Jordan's violence would be to place him in an empty room on another floor of the Calvary facility with a full-time counselor having a radio to call for help should violence occur.  Even plaintiff's experts will concede that their proposals of additional training and structure might not work, and in any event will not assure the safety of other students or the counselors.

Furthermore, and perhaps more significantly, the *J.H.* court noted the dilemma that a day care faces by a violently misbehaving child by recognizing that maintaining the child in the program may subject it to litigation by the parents of the injured children.  If they removed plaintiff-child from the program, then there was a risk of litigation under the ADA, but if they permitted plaintiff-child to continue to participate in the program, there was a risk of harm to other children, some of whom have already been injured by Jordan.  The direct harm defense exists for precisely the this type of situation.

14

3.    <u>Plaintiff's claim fails as a matter of law because she has failed to
      exhaust administrative remedies.</u>

Exhaustion of administrative remedies is a necessary prerequisite to filing an injunction claim under Title III in federal court.  Since plaintiff has failed to exhaust administrative remedies, her ADA Title III claim cannot go forward.  Courts have persuasively concluded that exhaustion of administrative remedies is required under Title III of the ADA.  42 U.S.C. §12188(a)(1), which permits a private cause of action under Title III, incorporates some, but not all of the provisions of Title II of the 1964 Civil Rights Act, 42 U.S.C. 2000a-3:

> The remedies and procedures set forth in [Section 203 of Title II of the 1964 Civil Rights Act] are the remedies and procedures [Title III of the ADA] provides to any person who is being subjected to discrimination on the basis of disability in violation of [Title III of the ADA].  ***  Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this Title (42 U.S.C. §§12181 *et seq.*) does not intend to comply with this provision.

Title III of the ADA explicitly incorporates only Section 203 of Title II of the 1964 Civil Rights Act, but not Section 204 of that Act which requires exhaustion of administrative remedies.  However, this failure to explicitly incorporate the exhaustion requirement by statute has been dismissed by several courts, which have required exhaustion of administrative remedies under Title III.  *Mayes v. Allison* (D. Nev. 1997), 983 F. Supp. 923; *Snyder v. San Diego Flowers* (S.D. Cal. 1998), 21 F. Supp. 2d 1207, 1210.  See, also *Howard v. Cherry Hills Cutters, Inc.* (D. Col. 1996), 935 F. Supp. 1148; *Burkhart v. Asean Shopping Ctr., Inc.* (D. Ariz. 1999), 55 F. Supp. 2d 1013.

In *Mayes*, the court persuasively articulated why exhaustion is required under Title III by first noting that the Department of Justice regulations implementing the ADA incorporated 42 U.S.C.

§2000a-3(b), which permits an award of attorney fees.  28 C.F.R. 36.505; *Mayes*, 93 F. Supp. at 925.

Moreover, the court found the legislative history of the ADA to be dispositive of the issue of whether

exhaustion of administrative remedies was required:

> The legislative history is dispositive.  We first note that the Senate floor debate, cited by both sides, is inconclusive.  Senator Harkin indicated at one point during a colloquy with Senator Bumpers that exhaustion was required before filing suit, and then just moments later, in the same colloquy, stated that exhaustion was only required in employment discrimination cases.  135 Cong. Rec. S10734-02, S10759-10760 (Daily Ed. Sept. 7, 1989).  Senator Bumpers' attempt to clarify the issue was unsuccessful.  *Id.*
>
> By contrast, the more important legislative history, that contained in the "joint explanatory statement of the Committee of Conference," demonstrates an intent to adopt the entirety of 42 U.S.C. §2000a as the ADA's enforcement mechanism.  H.R. Cong. Rep. No. 101-596, at 80 (1990), reprinted in 1990 U.S.C.C.A.N. 565, 589.  Specifically, the House Amendment ultimately adopted by Congress "specifies that the remedies and procedures of Title II of the 1964 Civil Rights Act" shall be remedies and procedures for enforcement of 42 U.S.C. §12182. This implies that Congress intended for all of Title II of the 1964 Civil Rights Act (i.e., 42 U.S.C. §2000a) and not just one subsection, to apply to such enforcement actions.  There is nothing to the contrary in the rest of the legislative history.

*Id.*  As such, the court held that the exhaustion requirement of 42 U.S.C. §2000a-3(c) applies to private

enforcement actions under Title III.  *Id.*  See, also, *Snyder, supra.*

> 42 U.S.C. §2000a-3(c) provides, in relevant part:
>
> In the case of an alleged act or practice prohibited by this title *** which occurs in a State, or political subdivision of a State, which has a State or local law prohibiting such act or practice and establishing or authorizing a State or local authority to grant to seek relief from such practice *** no civil action may be brought under [42 U.S.C. 2000a-3(a)] before the expiration of thirty days after written notice of such alleged act or practice has been given to the appropriate State or local

authority by registered mail or in person, provided that the court may stay proceedings in such civil action pending the termination of State or local enforcement proceedings.

In the present case, plaintiff has neither initiated any local enforcement proceeding, nor provided appropriate notice to the Ohio Civil Rights Commission.  Accordingly, this suit cannot go forward at this time.

4.      Requiring defendants to accommodate the plaintiff-child would
        constitute an  undue burden.

42 U.S.C. §12182(b)(2)(A)(iii), which prohibits discrimination against disabled persons by failing to provide "auxiliary aids and services," provides for two defenses: (1) that the accommodation would fundamentally alter the service or good; and (2) that the accommodation would constitute an "undue burden."  An undue burden is defined as follows:

> Undue burden means significant difficulty or expense.  In determining whether an action would result in an undue burden, factors to be considered include–
>
> (1)      The nature and cost of the action needed under this part;
>
> (2)      The overall financial resources of the site or sites involved in the action; the number of persons employed at the site; the effect on expenses and resources; legitimate safety requirements that are necessary for safe operation, including crime prevention measures; or the impact otherwise of the action upon the operation of the site;
>
> (3)      The geographic separateness, and the administrative or fiscal relationship of the site or sites in question to any parent corporation or entity;
>
> (4)      If applicable, the overall financial resources of any parent corporation or entity; the overall size of the parent corporation or entity with respect to the number of its employees; the number, type, and location of its facilities; and
>
> (5)      If applicable, the type of operation or operations of any parent corporation or entity, including the composition, structure, and functions of the work force of the parent corporation or entity.

28 C.F.R. §36.104.

Thus, the undue burden defense, unlike the "fundamentally alter" defense, involves an inquiry into the finances of defendants, and the stress an accommodation would place on the defendant.

18

For example, in *Roberts*, Kinder Care, the defendant day care center, raised the defense of undue burden. The plaintiff argued that there was no undue burden associated with providing a personal care attendant to the child a few hours per week in light of Kinder Care's $2.4 million net income in the first quarter of 1994. However, the court was persuaded by the fact that it would have cost Kinder Care $200.00 per week for a personal care attendant, while it received only $105.00 per week for the child's care. While the financial loss associated with that particular child was persuasive, the court was also compelled by the fact that Kinder Care has just emerged from bankruptcy, and that the specific center at issue operated on a "shoestring budget." Thus, it is unclear whether taking a loss on one particular child, without other financial duress, constitutes an undue burden.

With respect to the defendants in this case, costs associated with Jordan alone may not constitute an undue burden. However, defendants maintain group day care at 51 locations in Northwest Ohio serving more than 2,600 children. An imposition of additional expense on all facilities to provide individual child care to the community would be an undue burden and expense.

### V.	PLAINTIFF'S CLAIM UNDER THE REHABILI-TATION ACT CLAIM FAILS AS A MATTER OF LAW.

#### A.	Elements of the Claim.

The substance of plaintiff's claim under Section 504 of the Rehabilitation Act, 29 U.S.C. §794, is substantially the same as a claim under Title III. 42 U.S.C. §794(a) states, in relevant part:

> No otherwise qualified individual with a disability in the United States *** shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to

19

discrimination under any program or activity receiving Federal financial assistance ***.

The Sixth Circuit has held that in order to successfully prosecute a claim under the Rehabilitation Act, a plaintiff must prove:

1.      That he suffers from a disability;

2.      He is otherwise qualified for participation in the program;

3.      He is being excluded from participation in, being denied the benefit of, or being subjected to discrimination under the program solely by reason of his disability; and

4.      The program or activity is receiving federal funding.

*Sandison v. Michigan High Sch. Athletic Ass'n. Inc.* (6th Cir. 1995), 64 F.3d 1026, 1030-1031.

The Rehabilitation Act is interpreted similarly to Title III; thus, the defenses of direct threat of harm and fundamental alteration apply with equal force to this claim as well.  See *Monette v. Electronic Data Sys. Corp.* (6th Cir. 1996), 90 F.3d 1173, 1177 ("The analysis of claims under the Americans with Disabilities Act roughly parallels those brought under the Rehabilitation Act ***.") See, also, *Andrews v. State of Ohio* (6th Cir. 1997), 104 F.3d 803, 807 ("because the standards under both of the acts are largely the same, cases construing one statute are instructive in construing the other.") Therefore, plaintiff's claim under the Rehabilitation Act, like the claim under Title III fails because the plaintiff-child poses a direct threat to other children in the program, and accommodating the plaintiff-child would constitute a fundamental alteration of the program.

Additionally, defendants are not liable under the Rehabilitation Act for two reasons:

1.      The plaintiff-child was not removed from defendants' day care program based "solely" on his disability; and

20

2.      Defendants are not recipients of federal assistance.

**B.      Jordan was not removed from the day care program solely
on the basis of his disability.**

Since Jordan was removed from the program for conduct that would merit removal of a child who was not disabled, the dismissal was not made "solely" of the child's autism.  To prosecute a claim under the Rehabilitation Act, a person must be excluded from activity or service "solely by reason of his or her disability."  29 U.S.C. §794(a).  See, e.g., *McPherson v. Michigan High School Athletic Ass'n, Inc.* (6th Cir. 1997), 119 F.3d 453, 460.  The Sixth Circuit has held that the phrase "solely by reason of *** his disability" provides a defense to a Rehabilitation Act claim if the plaintiff was removed from a program based on a requirement independent of his disability.  64 F.3d at 1031-1032.  In *Sandison*, two high school students with learning disabilities turned 19 prior to the beginning of their senior years in high school.  However, the Michigan High School Athletic Assn. prohibited students who turn 19 by September 1 of the school year from competing in interscholastic high school sports.  The plaintiff alleged that the rule prohibiting them from participating in interscholastic athletics violated the Rehabilitation Act.  The Sixth Circuit rejected this claim, holding that "under Section 504, the plaintiffs cannot meet the age requirement" solely "by reason of" their dates of birth, not "solely by reason of [disability]." *Id.* at 1033.  Furthermore, the Sixth Circuit also rejected the claim that the rule, although neutral on its face, had unjustifiably disparate impact on the disabled, reasoning  that even if the high school students did not have a disability, they were still ineligible due to their age. *Id.*  As such,

21

*Sandison* stands for the proposition that if a person with a disability would be ineligible for a program even if he did not have the disability, then he or she was not excluded based "solely" on the disability.

In the present case, the plaintiff-child engaged in a lengthy, well-documented record of violent behavior. It is unquestioned that any child, regardless of his disability, who engaged in such consistent and extreme misconduct would be subject to removal from the program.

       **C.     There is no evidence that defendants are recipients of Federal Financial Assistance.**

Defendants believe plaintiff will not be able to prove that the Child Care Program at Calvary is a recipient of Federal Financial Assistance. If this is the case, the court lacks jurisdiction to entertain plaintiff's claims under Section 504 of the Rehabilitation Act of 1973.

      **VI.    PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION UNDER OHIO LAW MUST ALSO BE DENIED.**

Ohio handicap discrimination law is similar to the federal Americans with Disabilities Act. Courts may look to regulations and cases interpreting the federal act for guidance in interpreting Ohio law. *Little Forest Med. Ctr. v. Ohio Civ. Rights Comm.* (1991), 61 Ohio St. 3d 607.

Ohio law pertaining to R.C. §4112.02(G) does contain a statutory scheme of investigation by the Ohio Civil Rights Commission. This must be exhausted before proceeding in federal court. *Watson v. Fraternal Order of Eagles*, 915 F.2d 235 (6th Cir. 1990). See also, *Halton v. Great Clips, Inc.*, 94 F. Supp. 2d 856 (N.D. Ohio 2000).

Finally, removal of federal subject matter jurisdiction under Title III of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act would leave this court with only supplemental jurisdiction and discretion not to hear plaintiff's pendant state law claims.  28 U.S.C. §1367.  It may be prudent to decline jurisdiction should plaintiff exhaust her administrative remedies or be unable to prove her Section 504 and Title III claims.

## VII.   CONCLUSION

For the foregoing reasons, plaintiff is not entitled to preliminary injunctive relief in this case.

Respectfully submitted,

EASTMAN & SMITH LTD.

/s/
John T. Landwehr (0021711)
(jtl@eastsmith.com)
Robert J. Gilmer, Jr. (0002287)
(rjg@eastsmith.com)
Katharine T. Talbott (0067971)
(ktalbot@eastsmith.com)
One SeaGate, 24th Floor
P.O. Box 10032
Toledo, Ohio  43699-0032
Telephone:  (419) 241-6000
Fax:  (419) 247-1777

Attorneys for Defendants

## PROOF OF SERVICE

A copy of the foregoing Memorandum In Opposition To Plaintiff's Motion For Preliminary Injunction has been electronically filed this 31st  day of October, 2000 to Thomas J. Zraik,

Esq., Law Offices of Thomas J. Zraik, 5579 Monroe St., Sylvania, Ohio 43560, attorney for plaintiff.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties

may access this filing through the Court's system.

/s/_____
Attorney for Defendants

24