IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Melissa Burriola,                                                    Case No. 3:00CV7593

for herself and as next friend of

Jordan Burriola

        Plaintiffs,

       v.                                                                    **Order**

Greater Toledo YMCA, et al.

        Defendants.

      This is a case brought under Title III of the Americans with Disabilities Act of 1990 ("ADA"), §

504 of the Rehabilitation Act of 1973, and § 4112.02 (G) of the Ohio Revised Code.  Plaintiffs allege

Jordan Burriola ("Jordan") was involuntarily and unlawfully terminated from the YMCA daycare

program based on his disability.  This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

Pending is plaintiffs' motion for a preliminary injunction requiring defendants to make appropriate

modifications and reinstate Jordan in the program. (Doc. 3).  For the following reasons, plaintiffs'

motion shall be granted.

**Background**

      Jordan is an 8-year-old child with autism.  Autism is a pervasive developmental disability and is

considered to be a neurological impairment characterized by significant deficits in verbal and non-verbal

communication, a tendency to engage in repetitive and stereotypical movements, and unusual reactions

to changes in routines or environments.  See 34 C.F.R. 300.7(c)(1).  As more fully discussed below,

Jordan manifests many of these symptoms.

Defendant YMCA of Greater Toledo ("YMCA") operates licensed group daycare facilities at several sites in the Toledo, Ohio area.  The facility at issue is located at the Calvary United Methodist Church ("Calvary").[1]  The license for this daycare facility requires a minimum ratio of one counselor to every 18 children.

Jordan was admitted to the YMCA group child care program in January, 1999.  Typically, Jordan spent two to two-and-one-half hours at Calvary after school.[2]  On days when school was cancelled, or during the summer school break, Jordan attended Calvary all day.

The symptoms of Jordan's autism that are relevant to Jordan's experience at Calvary include repetitive activities, movements such as flapping his hands, pounding his chest, pounding his head, and running into walls.  When noises or other stimuli overload Jordan, he may cry, run in circles, or run to hide from the noise.  Finally, and perhaps most relevant to the present motion, Jordan has exhibited violent and destructive behavior on occasions when he has become extremely frustrated.  Such behavior includes hitting himself or other children, hitting a counselor, biting other children, cursing, throwing objects, chasing children, and urinating on the floor.

During the twenty months Jordan participated in the YMCA daycare program, plaintiff Melissa Burriola, Jordan's mother, was made aware of several "incidents" involving the inappropriate behaviors described above.  Melissa Burriola spoke with defendant Kathy Miley, the director of Family Services

---

[1] Calvary is operated by YMCA branch affiliate West Family YMCA.

[2] Jordan attends the M.O.D.E.L. Community School, a charter school established to serve the needs of autistic children.

for the West Family YMCA, regarding Jordan's autism.  Melissa Burriola informed the Calvary staff that Jordan required some attention such as providing written activity schedules, offering explanations when Jordan was to transition from one activity to another, and providing him with a quiet place to "recoup" when he became frustrated.  Also, Melissa Burriola told Miley that professionals from the M.O.D.E.L. Community School were available to help the YMCA daycare staff if the need arose.

Melissa Burriola requested that Joan McCarthy, the M.O.D.E.L. Community School's Education and Transition Coordinator, come observe Jordan at Calvary so that McCarthy could then assist the Calvary staff to work successfully with Jordan.  McCarthy's job at the M.O.D.E.L. Community School includes providing technical assistance to other agencies and persons regarding autism and ways to accommodate and modify activities for children with autism.  McCarthy has worked with Jordan since he was enrolled at the M.O.D.E.L. Community School in the fall of 1998.

After observing Jordan at Calvary, McCarthy made several recommendations to the Calvary staff that she believed would help make Jordan's experience at Calvary, and the staff's experience in working with him, successful. McCarthy also made free training available to all the YMCA employees who worked with Jordan.  The training was not made mandatory for the employees, and only two Calvary counselors attended the training.

The training focused on autism generally and on Jordan specifically, and taught techniques for working with autistic children.  The two counselors who attended the training learned some simple techniques, such as using visual re-direction signs, for working successfully with Jordan.  McCarthy and the counselors discussed modifications, or "supports," that would work well for Jordan at Calvary, and could easily be implemented.  Suggested modifications included a written schedule of daily activities,

3

visuals (a signal for certain behavior, such as "sit quietly," "self control," or "check schedule," used in place of auditory commands) to redirect Jordan, and use of a "break" card.

It is clear that the supports were never implemented for Jordan at Calvary.   According to one of the counselors who attended the training, former Calvary Site Director Jerry Kelly, Miley instructed the staff not to implement any of the supports.  Kelly stated that he used a written schedule successfully for a brief period, but stopped using such schedules when he ran out of supplies to make them.[3]

Kelly and the other counselor who attended the training left Calvary shortly after the training occurred, and before any other supports were implemented.  Thus, by late August, 2000, there were no counselors at Calvary who were trained in working with autistic children generally or Jordan specifically, and no counselors attempted to implement the suggested supports.

McCarthy became concerned after learning that the two trained counselors would soon be leaving Calvary, and on August 8, 2000, sent a letter to Miley.  In her letter, McCarthy stated that she was concerned that the two trained counselors were leaving.  She outlined for Miley the suggested supports the counselors learned at the training.  With regard to the written schedule, McCarthy suggested that in addition to certain activities available at Calvary, the schedule could include activities from Jordan's school file folder.  Jordan's teacher would share these activities, and Jordan could work on them during scheduled homework time.  Finally, McCarthy offered another training session, free of

---

[3] Prior to the training provided by McCarthy, Kelly attended a seminar in Bowling Green, Ohio, where he learned about autism.  Kelly stated that after the seminar he had a better idea about how to work with Jordan and that Jordan could participate normally at Calvary when Kelly took the simple steps of explaining activities to Jordan, letting Jordan know in advance what activity was going to be done, and letting Jordan spend scheduled time on the Nintendo games.  No specific supports, such as visuals for re-direction or a written schedule, were implemented after the Bowling Green seminar.

cost, to YMCA employees who would be working with Jordan.[4]  Miley never responded to the letter. None of the suggested supports were implemented, and no additional counselors were trained.

When Kelly left Calvary, Jordan's inappropriate behavior, and apparently the staff's inability to help Jordan avoid such behavior, increased.  Two weeks after Kelly left, Melissa Burriola received a letter from Miley informing her that Jordan was to be terminated from the daycare program.  The letter was dated September 6, 2000; Jordan's termination was effective September 8, 2000.

Discussion

The purpose of a preliminary injunction is to determine if there exists sufficient evidence to support the exercise of a court's discretionary power to issue preliminary equitable relief. Adams v. Federal Express Corp., 547 F.2d 319 (6th Cir.1977). In deciding whether to issue a preliminary injunction, a district court must consider:

> (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the injunction; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction.

Dayton Area Visually Impaired Persons v. Fisher, 70 F.3d 1474, 1480 (6th Cir.1995) (citing Washington v. Reno, 35 F.3d 1093, 1099 (6th Cir.1994)).

These four considerations are "factors to be balanced, not prerequisites that must be met." In re DeLorean Motor Co., 755 F.2d 1223, 1229 (6th Cir.1985). "Not all of these factors fully need to be established for an injunction to be proper," nor is any one factor "given controlling weight." Michigan

---

[4] The training McCarthy offers is a minimum of two and one-half hours, but McCarthy stated she would be willing to spend more time with any employees who were interested or willing.

5

State AFL-CIO v. Miller, 103 F.3d 1240, 1249 (6th Cir.1977).  Consideration of these four factors

leads me to conclude that injunctive relief is appropriate in this case.

## I. Probability of Success on the Merits

Title III of the ADA asserts a general prohibition on discrimination based on disability by places

of public accommodation.  42 U.S.C. § 12182 (a).  Specifically, the statute provides that

"It shall be discriminatory to subject an individual . . . on the basis of a disability . . . to a denial of the

opportunity of the individual or class to participate in or benefit from the goods, services, facilities,

privileges, advantages, or accommodations of an entity."  42 U.S.C. § 12182 (b)(1)(A)(i).  The statute

provides that, for purposes of subsection (a), discrimination includes "a failure to make reasonable

accommodations in policies, practices, or procedures, when such modifications are necessary to afford

such goods, services, facilities, privileges, advantages, or accommodations to individuals with

disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter

the nature of such goods, services, facilities, privileges, advantages, or accommodations."  42 U.S.C. §

12182 (b)(2)(A)(ii).

As a preliminary matter, it is undisputed that the defendant daycare center is a place of public

accommodation for purposes of the ADA.  See 42 U.S.C. § 12181 (7)(K).  Also, it is undisputed that

Jordan is an individual with a disability.  See 42 U.S.C. § 12102 (2).

Defendants claim that Title III of the ADA requires administrative exhaustion.  This argument is

not well-taken.  Traditional canons of statutory construction lead to the conclusion that Title III has no

administrative exhaustion requirement.  See Guzman v. Denny's Inc., 40 F.Supp. 2d 930, 933-34

(S.D. Ohio 1999).

In order to succeed on their claim under the ADA, plaintiffs must show that Jordan could succeed at Calvary with reasonable modifications, and that defendants failed to make such modifications.  In light of Jordan's past experience at Calvary, I find that plaintiffs have a substantial likelihood of establishing that Jordan can succeed at Calvary with reasonable modifications.  For nearly twenty months, Jordan was enrolled at Calvary with no mention of termination.  During this time period there was at least one counselor who made sincere efforts to work with Jordan and to accommodate his needs.  This counselor never had the chance to implement the simple supports that were suggested for Jordan, yet, with the efforts he did make, Jordan was able to participate in the program.  After this counselor left, no other counselors attempted to accommodate Jordan, and it was at this time that Jordan's inappropriate behavior caused defendants to want to terminate him.  I find that the counselors, and specifically Miley, were unwilling to try to accommodate Jordan, and I believe that if they had tried to do so, he would not have been terminated from the program.[5]

Defendants seek to defend this claim by showing that the modifications would fundamentally alter their daycare program, and/or would cause an undue burden to defendants.  Finally, defendants argue that plaintiffs' claims must fail because Jordan presents a direct threat of physical harm to other children in the daycare program.

I do not find defendants' arguments well-taken.  In applying the statute to the facts before me, I conclude that plaintiffs have a substantial likelihood of success on the merits of their discrimination

---

[5] Defendants' expert gave opinion testimony to the effect that Jordan could not succeed at Calvary even with modifications. With the fact before me that for nearly twenty months Jordan's presence at Calvary was not questioned, I do not find this opinion compelling.

claim.[6]

## A. The Proposed Modifications would not Fundamentally Alter Defendants' Program

Defendants argue that they did not unlawfully discriminate against Jordan in refusing to

implement the proposed modifications because the modifications would fundamentally alter their

program.  See 42 U.S.C. §§ 12182 (b)(2)(A)(ii), 12182 (b)(2)(A)(iii).  Defendants' argument is based

on the assertion that Jordan requires one-on-one supervision to succeed at Calvary, and to provide

such supervision would fundamentally alter the nature of defendants' group care facility.

Plaintiffs, however, do not ask that Jordan be provided with a one-on-one assistant.[7]  To the

extent that defendants argue a fundamental alteration would occur because the modifications require the

staff to give one-on-one attention to Jordan, I still find plaintiffs are likely to succeed.  In any group

child care setting, a group counselor may be required, at times, to provide one-on-one care to an

individual child.  Counselors must give individual attention to children who become upset or injured;

---

[6] I will not undertake separate analysis of the likelihood of success on the claims under the Rehabilitation Act or O.R.C. § 4112.02 (G).  I note, instead, that in light of my analysis of the ADA claim, success on these two claims is also likely.  The Rehabilitation Act applies in this case because plaintiffs have shown that defendant YMCA receives federal funds.  Because it is well established that the ADA and the Rehabilitation Act are similar in scope and purpose, see McPherson v. Michigan High School Athletic Ass., Inc., 119 F.3d 453, 459-60 (6th Cir. 1997), my analysis of the likelihood of success of the ADA claim applies by analogy to the Rehabilitation Act claim.  Likewise, because O.R.C. § 4112.02 (G) parallels Title III of the ADA, the likelihood of success on the ADA claim establishes a likelihood of success on the state law claim.

[7] It is noted here that a one-on-one assistant was hired for an extremely brief period to work with Jordan and other special needs children.  This person was paid for by outside funding, and thus worked no hardship to defendants.  Also, there is another autistic child at Calvary who has a one-on-one assistant.  Thus, the mere presence of a one-on-one assistant cannot fundamentally alter the nature of defendants program.  In the event that outside sources seek to provide a one-on-one for Jordan in the future, it is highly unlikely this fact could constitute an undue burden or a fundamental alteration.

8

they may be called upon by any child to answer a question or help with a task.

The modifications for Jordan include the task of preparing a daily schedule.  As Melissa Burriola testified, these schedules can be made up in a few minutes.  Additionally, there is nothing to suggest that the same schedule could not be used on multiple days.  The effort of preparing a schedule for Jordan may vary from the norm of what counselors do, but it cannot be said to fundamentally alter the program.  Additionally, plaintiffs assert that with the schedule, Jordan can work independently and occupy himself with tasks for longer periods of time.  Thus, the schedule may actually reduce the amount of time counselors have to spend giving one-on-one attention to Jordan.

The modifications also require counselors watch Jordan's behavior to spot "warning signs" such as verbal communication becoming louder and confused, increased arm and leg movement, and crying sounds or actual crying.  Counselors must watch for these behaviors in order to implement the visuals or the break card for redirection.

Defendants are unlikely to be able to demonstrate that this attention works a fundamental alteration to their daycare program.  First, as Kelly and other counselors testified, a daycare counselor should be aware of what all the children are doing at all times.  Counselors must be aware of improper, or odd behavior of all the children to prevent fights, accidents, or other mishaps.

The "warning signs" Jordan exhibits are not so discrete to require close scrutiny at all times.  Rather, the behaviors are conspicuous and likely to be caught by attentive counselors.  According to plaintiffs and to the professionals who work with Jordan, the modifications of visuals and a quiet break place will successfully redirect Jordan before he loses self-control.  Additionally,  plaintiffs suggest that the use of a schedule, as well as telling Jordan in advance of changes to the schedule, will prevent

9

Jordan from getting frustrated and exhibiting the "warning signs" at all.

## B. The Proposed Modifications Do Not Create an Undue Burden

Defendants next argue that they did not unlawfully discriminate against Jordan in refusing to implement the proposed modifications because the modifications would create an undue burden. See 42 U.S.C. § 12182 (b)(2)(A)(iii).  Defendants are not likely to succeed with this defense.

First, the modifications, including the training for Calvary staff members, are available to defendants at little or no cost.  The training itself is free.  Many of the supports, such as visuals and a break card, have already been given to Calvary staff free of charge by McCarthy.  The games and activities that are to be included in Jordan's schedule are already present at Calvary, and the file folder activities will be provided by Jordan's teacher.  Finally, the cost of the supplies to make a daily schedule for Jordan, which includes, as far as I can tell, paper and markers, is simply not unduly burdensome.

The time required for the training is only two and one-half hours, which is not unduly burdensome.  Finally, the time and effort required to implement the supports, as discussed above, is not unduly burdensome.

## C. Jordan Does Not Pose a Direct Threat Under the ADA

Defendants argue that they did not unlawfully discriminate against Jordan in refusing to implement the proposed modifications because if Jordan remained in the daycare program, he would pose a direct threat to the health or safety of others.  See 42 U.S.C. § 12182 (b)(3).

Defendants correctly point out that Jordan has demonstrated physically aggressive behavior in the past which creates a danger of harm to other children in the program.  Plaintiffs argue, however, that

10

none of the supports were in place when Jordan acted aggressively.  Defendants' expert testified that

no matter what modifications were made at Calvary, no one could ensure that Jordan would not act

aggressively in the future.

Plaintiffs concede there is no such guarantee, and argue that there is no guarantee on the

behavior of any child.  Calvary staff testified that there are several children at Calvary who frequently hit

other children.  Significantly, defendants have not produced evidence that any of these children have

been terminated from the program.  In addition to the fact that Calvary cannot guarantee the behavior

of any child in its daycare program, it is significant that Jordan has never had the benefit of any of the

proposed modifications at Calvary.  According to plaintiffs and the professionals who work with Jordan

at school, the modifications will significantly reduce the chances that Jordan will become frustrated at

Calvary and thus lose self control and act aggressively. Cf. J.H., A Minor Child v. ABC Care, Inc.,

953 F.Supp. 675, 682 (D. Md. 1996) (finding direct threat existed when consistent course of

aggressive behavior existed, and parents of minor child demanded reinstatement to daycare program

but refused to provide relevant health information about the child and had no new suggestions for

management of behavior problems). Thus, it appears that the modifications will mitigate the risk that

Jordan will harm others.  See 28 C.F.R. § 36.208 (c).

In light of my analysis of defendants' three defenses, I find that plaintiffs have a substantial

likelihood of prevailing on their claim that Jordan can succeed with reasonable modifications and that

defendants unlawfully discriminated against Jordan when they refused to make any of the modifications.

## II. Irreparable Harm to Jordan

Other courts have found that irreparable harm exists when, without injunctive relief, an

11

individual will be denied the opportunity to participate in group athletic or school activities.  See, e.g.,

Alvarez v. Fountainhead Inc., 55 F.Supp. 2d 1048, 1051 (N.D. Cal.1999) (finding possibility of

irreparable harm where child would be excluded from benefits of preschool, including learning to play

with peers, and no readily available alternative programs exist); Sandison v. Michigan High School

Athletic Ass., Inc., 863 F.Supp 483, 491 (E.D. Mich. 1994), *rev'd in part on other grounds*, 64

F.3d 1026 (6th Cir. 1995) (finding possible irreparable harm where high school students would be

denied opportunity for social and academic development provided by participation in athletic

programs).  I agree with these courts that irreparable harm can exist when an individual is completely

denied the opportunity to participate in the benefits, especially developmental benefits, of a public

accommodation.  Because there are no alternative placements available for Jordan presently,

irreparable harm may occur if injunctive relief is not granted.

Additionally, the irreparable harm requirement is met when the injuries plaintiff would incur are

"the very type of injuries Congress tried to avoid."  E.E.O.C. v. Chrysler Corp., 733 F.2d 1183, 1186

(6th Cir. 1998) (internal citations omitted).  Because Jordan's injuries would be the result of

discrimination based on disability, they are the very type of injuries Congress sought to avoid in enacting

the ADA. See generally 42 U.S.C. § 12101(b).

### III. Probability of Substantial Harm to Others

As discussed above, the risk of harm to other children, as well as Calvary staff, is mitigated by

proper implementation of the proposed modifications.  Thus, I find that the probability of substantial

harm to others is low.

### IV.  The Public Interest is Served by Granting an Injunction

Requiring defendants to reinstate Jordan with proper modifications in place furthers public interest and carries out the intent of Congress in adopting the ADA.  There is no doubt that protecting against violations of federal laws serves the public interest.  Additionally, the purpose of the ADA is served by injunctive relief aimed to prevent further discrimination against an individual with a disability.

### Conclusion

I find that plaintiffs have shown a substantial likelihood of success on the merits of their discrimination claim.  Additionally, I find that, after considering the four factors above, injunctive relief is appropriate.

For the foregoing reasons, it is hereby

**ORDERED THAT** plaintiffs motion for a preliminary injunction be, and hereby is, granted:

1. All Calvary counselors and staff who will work with Jordan shall undergo the free training offered by the M.O.D.E.L. Community School not later than January 20, 2001;

2. The reasonable modifications proposed by plaintiffs shall be implemented not later than January 20, 2001;

3.  The defendants, their agents, and employees shall make a good faith effort to inform plaintiffs of expected changes in staff or other conditions at the Calvary site; and

4. Jordan shall be reinstated to the Calvary daycare program not later than January 20, 2001.


/s/ James G. Carr
James G. Carr
United States District Judge

13

14